James L. Bohannon, Plaintiff, v. Joseph T. Ryerson & Son, Inc., a Corporation, and Universal Fabricated Products Co., Inc., a Corporation, Defendants.
Joseph T. Ryerson & Son, Inc., a Corporation, and Universal Fabricated Products Co., Inc., a Corporation, Third Party Plaintiffs-Appellees, v. Industrial Maintenance, Inc., a Corporation, Third Party Defendant-Appellant.

Gen. No. 50,403.

First District, Second Division.

June 28, 1966.

Rehearing denied September 12, 1966.

Andrew J. Farrell, of Chicago, for third party defendant-appellant.

Howard, French and Healy, of Chicago, for third party plaintiffs-appellees.

MR. JUSTICE LYONS delivered the opinion of the court.

This is an appeal from a judgment in favor of the third party plaintiffs who had filed third party actions against the third party defendant.

Joseph T. Ryerson & Son, Inc., hereinafter referred to as the owner Ryerson, is a corporation engaged in the business of fabricating and selling structural steel products and in connection with its business owns and operates a warehouse known as the "South Warehouse" at 2558 West 16th Street in Chicago, Illinois. Universal Fabricated Products Co., Inc., hereinafter referred to as the contractor Universal, is a corporation engaged in the manufacture, processing, fabricating, and sale of insulation materials. Industrial Maintenance, Inc., hereinafter referred to as the subcontractor Industrial, is a corporation engaged primarily in the construction business, specializing in sandblasting and painting of storage tanks for the petroleum industry and in general construction and maintenance work on structures and build-

398

ings. Charles P. Lind is president of subcontractor Industrial.

Owner Ryerson's South Warehouse is a rectangular building used primarily for the fabrication and storage of steel structural building materials. It is approximately two blocks long from north to south and is about 550 feet wide from east to west along 16th Street. The exterior walls and roofs are constructed of corrugated steel. The floor is concrete and the structure from the floor to the peaks of the roofs is equivalent to a height of three stories. The warehouse has "seven-peaked roofs" which divides the building into seven sections known as "spans." These "spans" are alphabetically identified from "A" to "F." The peaks of the roofs extend from east to west. These spans vary in their dimensions, from north to south, from 40 feet to 108 feet and run the entire width of the building from east to west. The roof is supported by vertical steel columns, placed 23 to 25 feet apart. They are approximately six inches wide and flat at the top. Steel beam trusses, about seven inches wide at the top with flanges which project upward from the upper surface, are located 25 feet apart and run from north to south. The space between two trusses is known as a "bay." There are 24 bays in each span. Three-inch steel beams run diagonally across the bays. There were two or more electric cranes in each span, which were not used in this project.

Early in January of 1953, owner Ryerson, became interested in placing a false ceiling in the south warehouse in order to reduce the cube of the building, which in turn would lessen the cost of heating the warehouse in winter and keeping it cool in the summer. A salesman from contractor Universal, called upon Robert Dent, director of engineering for owner Ryerson, to sell insulation fabrications, manufactured and sold by contractor Universal. This led to a series of conferences and the exchange of letters between Dent and William Waite, the

manager of contractor Universal. In some of these meetings, Paul Gross, William Ourand and R. E. Wallace, engineers employed by owner Ryerson, were also present.

The concluding paragraph of a letter dated February 6, 1953, from Universal to Ryerson reads as follows:

> We estimate that the above application can be installed complete for $0.80 to $0.90 per square foot of total area insulated. We are submitting this proposal for your information only. In order to prepare a firm bid, it will be necessary for us to spend considerable time in determining the actual areas involved, details of the steel structure, window and door areas, etc.
>
> *We understand that the warehouse is to continue in operation during erection of the insulation, and it will be necessary to reach a working agreement with Ryerson regarding the working conditions and available working areas for our erection crews.*
>
> We would appreciate your study of our intended application, and erection price. If the system is satisfactory and the price is generally in line, we will then make a complete study and submit a firm bid on this work.
>
> /s/ William Waite. (Emphasis supplied.)

On July 10, 1953, contractor Universal, sent a lengthy letter to owner Ryerson, in which it set forth in detail the manner in which the work was to be performed, the material, and equipment to be used. The letter also quotes a firm price. We quote one of the paragraphs from said letter:

> We would prefer to continue using the 2 x 2 mesh No. 14 gauge galvanized wire as opposed to previous suggestions of lighter mesh wire. If this wire is used, we do not believe it to be necessary to pro-

vide support rods in the larger spans D & E. *Sufficient strength is available in the wire itself because one of our erection crew was walking on the wire until he was cautioned to use scaffolding only.* (Emphasis supplied.)

Shortly before the date of the foregoing letter an experimental insulation was carried on in three bays of span F. This resulted from a combination of ideas between Waite of contractor, Universal, and Dent, of owner Ryerson. Their object was to determine the cost basis for the work and perfect the method of performing it. The purchase order for that job from owner Ryerson, to contractor Universal, was dated May 1, 1953. The actual work started about June 15 or 20, 1953. Mr. Gross was assigned to that job on behalf of owner Ryerson. Waite of contractor Universal, was also present during the experimental job, as were employees of subcontractor Industrial, including Lind.

For several weeks Dent and Waite discussed the installation of the insulation. They discussed the use of J–bolts for fixing steel wire mesh to the side of the span, the use of angle irons with flat bars to affix the extremities and the manner of connection of the wire mesh at the sides and end. They agreed that five-foot wide wire mesh was to be used in the bays in such position that one layer of wire mesh would overlap the other layer. The wire to be supplied in 150 foot lengths. The bays varied between 40 and 108 feet so that the rolls would have to be cut. This was to be done to minimize the waste of wire. The cost factor of the job to be performed was determined from the experimental job. The use of scaffolding on the larger job was not discussed. According to Waite of contractor Universal, "the insulation was not intended to be anything that would support one's weight. Nobody was supposed to walk on it."

401

Owner Ryerson, was supposed to supply all of the metal components but the hog or pen rings. Waite had a conversation with Dent relative to the pen or hog rings prior to the start of the experimental work. It was also set forth in one of the exhibits, 12–C, that owner Ryerson, was to supply all metal component parts except pen rings. Contractor Universal, sent the pen rings to owner Ryerson, and charged for them. It also supplied pen rings to subcontractor Industrial. The actual work on this job had to be done so that it would not interfere with the regular work of owner Ryerson, in the warehouse.

On September 18, 1953, a purchase order signed by Dent was sent by owner Ryerson, to contractor Universal. The same reads as follows:

Install a false ceiling just above the lower chord of the roof trusses in twenty-four panels of span "E," Insulating material to be 1½" of fiberglass foil-faced jacketing, which will be furnished by you. All steel members to be furnished by Ryerson.

Cost $.3715 per square foot, in accordance with your letter of August 13, 1953.

Labor to fabricate and install four galvanized steel stacks to extend roof ventilators to the bottom chord of the truss. Details pertaining to the steel stacks to be developed and price quoted after the first stack is installed. Steel will be furnished by Ryerson.

The installation on spans "E" and "F" started in September of 1953. The work started during the week at 8:00 o'clock in the evening and Saturdays at 1:00 p. m. The time put in depended upon the availability from owner Ryerson's standpoint.

On November 14, 1953, plaintiff, James L. Bohannon, an employee of subcontractor Industrial, came to work

around noon and commenced work with the wire crew on span "E," consisting of himself, Parks, Foss and Nicholai. Plaintiff had worked for about two hours prior to the occurrence. At that time, he went to pull the number four wire into place with a stick. He started about two struts north of the south end. Then he went to the end of the crane, climbed to the truss and started to walk north on the truss. When he came to the second strut, he walked west on it until he came to the number four wire panel. At this point he was squatting on the six-inch surface of the strut, on top of the number five panel of wire which had already been stretched and anchored and about three or four feet west of the truss. He was perfectly balanced until he heard a noise. He also experienced a sensation which felt like the wire was being jerked out from under him. Then he lost his balance and fell to the floor of the warehouse.

Foss who was working below him at the time, heard "a little ping" and looked up. He saw the wire pulling apart and plaintiff fall. After plaintiff fell, Alvin Stevens went up to fix the number five panel of wire. When he reached the wire, he found that no part of the fabric was broken and that some of the hog or pen rings remained in the wire. These rings, however, were open. In repairing the wire, Stevens testified that they overlapped the wire about twelve inches, the same as before. They did not remove the angle irons from the wire itself and did not add any new wire. The only difference after the repair had been completed was the new hog rings.

According to the testimony of William Waite (Universal), William Junius Park (Industrial), William C. Foss (Industrial), James Millard (Industrial), Charles P. Lind (President of Industrial), and plaintiff, Bohannon, no scaffolding, planks or staging was used in the installation of the wire mesh.

403

Lind of subcontractor Industrial, testified that it would have been impossible to use scaffolding because they only had five or six hours in which to work, and it would have taken more than six hours to erect scaffolding; that they were told they could only work from midnight to morning, and as a rule they did not get started until 2:00 a. m., and finished between 6:30 and 7:00 o'clock a. m., their hours of employment depending upon when owner Ryerson, finished its work; and that they were told that they were not to interfere with the first and second shifts of owner Ryerson, and that their material had to be out of the way when owner Ryerson's people came to work. Under cross-examination Lind testified that it would take more than 6 to 8 hours to build a scaffolding up from the floor and that it would take a whole truckload of men.

The two defendants filed third party actions against subcontractor Industrial, as third party defendant. The case was tried in the Superior Court of Cook County, and at the conclusion of all the evidence directed verdicts and judgments were entered in favor of subcontractor Industrial, third party defendant. A verdict was directed for subcontractor Industrial, as to both third party plaintiffs under the theory that the parties were joint tortfeasors and that under the Workmen's Compensation Act there could be no action over against plaintiff's employer. The case against the two defendants was submitted to the jury and a not guilty verdict was rendered in their favor. Post-trial motions were filed by all parties. The trial court granted a new trial in the case against both defendants and denied the post-trial motion for a new trial as to the third party causes of action. Petition for leave to appeal was denied by the Appellate Court in the original action and a direct appeal was taken to the Appellate Court in the third party actions.

The Appellate Court in Bohannon v. Joseph T. Ryerson & Sons, Inc., 16 Ill App2d 402, 148 NE2d 602 (1958), affirmed the judgments entered in the third party actions. Petition for leave to appeal was granted by the Supreme Court, however, and in an opinion filed on January 23, 1959, the judgment of the Appellate Court was vacated for want of an appealable order due to the absence of a certification as required by section 50 (2) of the Civil Practice Act. Bohannon v. Joseph T. Ryerson & Sons, Inc., 15 Ill2d 470, 155 NE2d 585 (1959). The cause was remanded to the Superior Court of Cook County for further proceedings. On May 28, 1958, while the matter was pending in the Supreme Court, an order was entered by the Superior Court of Cook County dismissing the case of plaintiff, as to the two defendants, settlement having been reached. The order also provided that defendants withhold $4,500 each, out of the settlement agreed upon pending disposition of the subrogation claim of subcontractor Industrial.

Upon the case being redocketed in the then Superior Court of Cook County, both third party plaintiffs filed motions to vacate the previous directed verdict as to their actions against subcontractor Industrial. The motion filed on behalf of the contractor Universal, was filed March 4, 1959.

Subcontractor Industrial, did not have a lien for Workmen's Compensation, but the Bituminous Casualty Corporation did have such a lien based upon an Intervening Petition filed by the company for payments made to and on behalf of plaintiff under the Workmen's Compensation Act. On March 16, 1959, an order was entered dismissing the Intervening Petition of the Bituminous Casualty Corporation and vacating the order of January 11, 1956, entered in accordance with such petition. On July 2, 1959, an order was entered directing each of the third party plaintiffs to pay the sum of $4,500 to the

plaintiff. On October 31, 1963, an order was entered by one of the judges of the Superior Court of Cook County vacating the verdict and judgment in favor of subcontractor Industrial, as to the third party action of Ryerson. No such order was entered as to the other third party plaintiff, contractor Universal.

The matter was assigned to another judge of the Superior Court of Cook County for trial on October 26, 1964. The jury demand was withdrawn and the cause submitted to the court without a jury. The court entered an order granting contractor Universal, leave to file a Supplemental Third Party Complaint. On November 20, 1964, an Amended Third Party Complaint was filed on behalf of contractor Universal. It was stipulated that the abstract of record in cases Nos. 47,035, 47,038, 47,101 and 47,102 filed in the Appellate Court be considered by the court as evidence. A copy of such abstract was marked "Joint Exhibit 1 in evidence." The present abstract was taken out of "Joint Exhibit 1 in evidence" which is now a part of the Report of Proceedings. The court entered judgments in favor of each of the third party plaintiffs in the sum of $16,000 from which order third party defendant appeals.

We agree with third party defendant, subcontractor Industrial's contention that the alleged injuries to plaintiff were not brought about by the use of a scaffold or any of the other contrivances or objects enumerated in section 60 of the Scaffolding Act.

Third party plaintiffs have offered no argument to rebut third party defendant's contention.

Section 60 of the Structural Work Act, Ill Rev Stats (1965) chap 48, par 60, reads in part:

> That all scaffolds, hoists, cranes, stays, ladders, supports, or other mechanical contrivances, erected or constructed . . . for the use in the erection, repairing, alteration, removal or painting of . . . shall

be erected and constructed, in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person . . . engaged thereon, . . . .

The evidence is undisputed that plaintiff fell while standing on wire mesh, which was being installed as a base for a false ceiling for insulation purposes. Neither the strut or wire mesh was erected, constructed, placed or operated so as to give proper and adequate protection to any person engaged thereon. The strut was part of the building and the wire mesh part of the work being performed.

In an early Illinois case, Legowski v. Moreland & Co., 195 Ill App 377 (1915) the plaintiff, a laborer on a construction job, fell as he walked over some uncovered joists. An abstract decision was rendered by the Appellate Court, First District. The abstract of the decision on page 379 reads as follows:

2. *Master and Servant, § 137—when structural act inapplicable.* In an action to recover for personal injuries sustained by plaintiff as a result of falling from joists across which he was walking while employed by defendant as a general laborer, instructions which ignored section 1 of the "Structural Act" (Hurd's Rev Stats, ch 48, J & A paragraph 5368), relating to the construction of scaffolds, hoists, cranes, etc., *held* not erroneous for the reason plaintiff's fall was not due to defects in any of the appliances mentioned in that statute, which had no application to the case.

The foregoing case is cited with approval in Thon v. Johnson, 30 Ill App2d 317, 174 NE2d 400 (1961). (Petition for leave to appeal denied, 21 Ill2d 622.) In the Thon case an opening or gap four feet square was left

407

in the floor of a garage connected with a house being constructed. Workmen started to construct a form so that a concrete slab could be poured. Two two-by-eights were placed on their edges and spiked at the ends, so that plywood could be nailed to the bottom and the concrete slab poured. The bottom had not been placed in the form when the plaintiff, an electrician, stood upon one of the two-by-eights to work on a switch box on the wall of the garage. The board gave way and he fell to the bottom of the stairwell. Plaintiff recovered a verdict and judgment in the sum of $8,000, which was reversed by the Appellate Court of the Second District with the following comment on page 322:

> In view of the foregoing authorities we do not feel that the cement form upon which plaintiff stood in the case at bar can be considered to be a scaffold within the meaning of the statute. We are aware of the rule that our statute should be liberally construed, but if the statute were construed so as to cover the concrete form involved in this case, such a construction of the statute would be equivalent to holding that each and every place where a workman chooses to stand thereby becomes a scaffold within the meaning of the statute. No authorities have been cited which would justify such a construction. On the contrary, the authorities discussed herein appear to be quite pertinent and lend support to our conclusion that the concrete form involved in this case was not a scaffold within the meaning of the statute. In view of this conclusion, it is not necessary for us to determine the various other questions raised by the defense.

The case of Bradley v. Metropolitan Sanitary Dist., 56 Ill App2d 482, 206 NE2d 276 (1965) adopts the reasoning of Thon v. Johnson, supra, and holds that supports, protective sheets, stays, coverings and sidings,

which were installed to prevent mud and clay from falling on workers in an excavation for a drop manhole, were not structures within the Illinois Structural Work Act.

■ Furthermore, it is to be noted that several New York authorities are cited in the opinion of the Appellate Court in Thon v. Johnson, supra. Much of the Illinois Structural Work Act was taken from the New York Labor Laws of 1895 (Labor Laws, ch 50, art 10, sec 240, McKinney's Consolidated Laws of New York Anno Book 50, p 207). New York authorities are, therefore, to be considered in construing the Illinois statute. In Broderick v. Cauldwell-Wingate Co., 301 NY 182, 93 NE 2d 629 (1950), the defendant was charged with not furnishing a proper scaffold. Concrete floors were to be poured in sections of steel known as "bays." Each bay was planked over with a retaining platform or deck which was supported by shoring underneath. The plaintiff in the course of his work walked out on the deck and was caused to fall when a four-by-six supporting the deck broke. The Court of Appeals, the highest court of review in New York, *held that the deck was not a scaffold* under the New York Labor Law and made the following comment on page 631 of its opinion.

> In the courts below it has been held that the platform which here collapsed was not a scaffold within the meaning of section 240. With this view we concur, Welk v. Jackson Architectural Iron Works, 184 NY 519, 79 NE 1116; Wright v. Smith, 152 App Div 476, 137 NYS 264; Brady v. Pennsylvania Steel Co., 134 App Div 372, 119 NYS 75; note Adelstein v. Roebling Const. Co., 95 Misc 125, 159 NYS 36. This formwork was not intended as a place of work but, on the contrary, consisted of the work itself. Cf. Burnstein v. Haas, 272 App Div 1051, 75 NYS2d 293, affirmed 298 NY 596, 81 NE2d 328.

409

In Ericson v. Bradley Contracting Co., 150 NYS 169, the plaintiff's intestate stood upon a water pipe 18 feet above the bottom of the subway and was caused to fall by the pipe giving way. The court made the following statement on page 170 of its opinion:

> A temporary resting place for footing or support is incidental to the performance of the work, and to call such place a "scaffold" is a wrench, not only of the language, but of the intent, of the Legislature.

In Adelstein v. Roebling Const. Co., 95 Misc 125, 159 NYS 36, the plaintiff was standing on a wooden concrete form. He was caused to fall when the form gave way. The court concluded that the "form" was not a scaffold and made the following comments on page 38 of its opinion:

> The "form" which gave way below the plaintiff's weight in the case at bar was not intended, designed, or constructed for the purpose of supporting a workman in any event or on any occasion. It was used and intended to be used exclusively as a framework to contain and hold, while hardening, a section of concrete, which, when "set" became a part of the floor. Even if the defendant, or one of its representatives having adequate authority, either permitted or authorized persons occasionally to step upon or pass over this "form," while it might under appropriate circumstances be held for negligence in that regard, that would not change the character of the structure into a scaffold.

Here, at the conclusion of all the evidence counsel for the third party plaintiff Ryerson, moved that all the charges in the plaintiff's Complaint with the exception of those under sections 60 and 69 of the Scaffold Act be stricken. The motion was joined in by counsel for

the other third party plaintiff Universal, and was allowed by the trial court. There is no showing that any changes were made in the charges contained in the plaintiff's Complaint at any time prior to the settlement made by the two third party plaintiffs with the plaintiff on May 28, 1958. Such settlements were made with full knowledge that the charges in both Third Party Complaints were limited to violation of sections 60 and 69 of the Structural Work Act.

There is a total failure to prove that the injuries to the plaintiff were brought about by the use of a scaffold or any of the other contrivances enumerated in section 60 of the Structural Work Act. Both third party plaintiffs, therefore, failed to prove an essential element under their Third Party Complaints.

In arriving at this result, we are aware of the decisions in cases such as Bounougias v. Republic Steel, 277 F2d 726 (7th Cir 1960), Oldham v. Kubinski, 37 Ill App 2d 65, 185 NE2d 270 (1962), Miller v. DeWitt, 59 Ill App2d 38, 208 NE2d 249 (1965), Reed v. Johnson, 55 Ill App2d 67, 204 NE2d 136 (1965). The case most favorable to third party plaintiffs is Bounougias v. Republic Steel, supra. In that case plaintiff was an employee of a painting contractor, who was painting the upper structure or ceiling of the Republic Steel Plant. He was working from an overhead crane, which ran the full length of the steel mill. While he was working on a drum of the overhead crane, one of his fellow workers in the cab of the crane, accidently pulled one of the control levers in the cab and caused the drum to start rotating. The worker on the top of the drum fell to the ground and was seriously injured. The court held that the crane, since its erection, had been used as a scaffold in maintaining the structure about it and that, therefore, this was one of the purposes for its erection. There was evidence submitted that the people at Republic Steel had repeatedly used the crane to paint or clean

411

the top of the steel mill. Furthermore, the court found that the crane was not a permanent part of the building.

In the case at bar, we find that the struts were a permanent part of the building. Therefore we hold, in accordance with Parizon v. Granite City Steel Co., 71 Ill App2d 53, 218 NE2d 27, decided on May 18, 1966, that a permanent structure is not a structure within the terms of the Illinois Structural Work Act. Furthermore, to resolve any conflicts that may exist between the case at bar and Bounougias v. Republic Steel, supra, and the dissenting opinion in Parizon v. Granite City Steel Co., supra, we find there was no evidence submitted in the instant case to show that the struts were used on prior occasions other than to support the roof of the building and that, therefore, the use of the struts as a scaffold was not contemplated when they were installed. As we pointed out above, the wire mesh was part of the work in progress and, therefore, not a structure within the Illinois Structural Work Act.

We do not consider the other contentions raised by the parties because we find the Third Party Complaint should have been dismissed by the lower court. For the above reason, the judgment is reversed and the cause remanded with directions to enter judgment in favor of the Third Party defendant and against the Third Party plaintiffs.

Judgment reversed and the cause remanded with directions to enter judgment in favor of the third party defendant and against the third party plaintiffs.

BRYANT, P. J. and BURKE, J., concur.