**Edward L. Spiezio, Plaintiff-Appellee, v. Commonwealth Edison Company, a Corporation, Defendant-Appellant.**

**Gen. No. 51,677.**

First District, First Division.

February 5, 1968.

Rehearing denied March 4, 1968.

Hackbert, Rooks, Pitts, Fullagar & Poust, of Chicago (Harlan L. Hackbert and Jeremiah Marsh, of counsel), for appellant.

James A. Dooley, of Chicago, for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

This is a personal injury action based on alleged violations of the Structural Work Act (Ill Rev Stats, c 48, §§ 60–69). Plaintiff, an ironworker, fell 40 or 42 feet from a steel column and was seriously injured. He was an employee of Bethlehem Steel Company, then engaged in the erection of an addition to a power plant of defendant, Commonwealth Edison Company. Defendant appeals from a $190,000 verdict and judgment entered against it as owner in charge of work being performed on its premises by Bethlehem Steel Company. The jury answered "Yes" to special interrogatories whether defendant had "charge of the work" and whether plaintiff's injuries were occasioned by "a wilful violation of the Structural Work Act, or a wilful failure to comply with any of its provisions."

On appeal, defendant does not challenge the amount of the verdict. Defendant contends (1) there were no violations of any provisions of the statute; (2) defendant was not "in charge of" the work of Bethlehem so as to be guilty of a "wilful violation" of the statute; and (3) defendant asserts prejudicial trial errors and erroneous instructions.

On October 8, 1957, Bethlehem Steel Company was engaged in the erection of structural steel for an additional generating unit to Commonwealth Edison's power plant between Rockdale and Joliet, Illinios. Bethlehem was a prime contractor, and the area of the construction project

where plaintiff fell was intended to be the boiler and turbine room.

Plaintiff was 42 years old and had worked as an ironworker since 1941. On the afternoon of October 8, he was assigned to work as a "connector." The work of a connector is to line up the bolt holes in a horizontal beam with the bolt holes in the vertical column with a spud wrench and to insert and tighten enough bolts to hold the beam in place until the "bolter-upper" crew can place and tighten the remainder of the bolts to be used. Each piece of structural steel is fabricated in accordance with the plans for the particular place where it is to go in the structure, and the bolt holes are designed to be opposite each other when in place.

The ironworkers doing work as "connectors" carry, as did plaintiff, two "spud" wrenches, 18 inches long, in a holder. At one end of each spud wrench are jaws to fit the nut to be screwed onto a bolt that the connector is to insert into the holes fabricated in the column and beam. For that purpose he also carries with him a bolt bag and sledgehammer. The opposite ends of each spud wrench are narrow, tapering shanks, which are inserted into the holes of the column. The connector must hold and stand on one or both spud wrenches to get into position. He must then remove at least one of the spud wrenches to use the tapered end of the spud wrench to line up the holes in the vertical column and horizontal beam which are to be bolted together.

Plaintiff was directed by his foreman to connect a horizontal beam to the south face of a column at about 80 feet above the ground level. Plaintiff climbed the north face of the column, the side opposite to that on which he was to make the connection. The column, which was H-shaped, was an unusually wide one. Plaintiff climbed by holding the flanges and "walking up" the rivet heads in the face of the column. This was the customary way

to climb a column of that size, and other men had climbed the column that way earlier that day to connect a beam at a lower level. There was no other way for a connector to get to the place where the beam was to be bolted, and plaintiff was familiar with the manner of climbing that kind of column.

Plaintiff had to climb almost 40 feet to get into position to make the intended connection, and it was necessary for plaintiff to get to the opposite side of the column where the beam was to be swung into place by a crane. He fell from that point, roughly 40 or 42 feet down to a plank floor.

Plaintiff could not recall much of what happened. He thought he had got his spud wrenches in holes in the web of the column at about waist level, and that he tried to get one foot on one of the wrenches to support himself. He thought one of the spuds fell out—"All I remember is I was trying to get on the spud and the next thing I knew I was in the hospital. I hardly remember falling or anything, but I came to in the hospital, I don't know how many days later." He further testified, "On a narrow column in case anything happens, you get tired or something, if you start to fall, you can grab this, and hang on. With a wide column there is nothing to grab. When you go to fall you are done."

At the close of plaintiff's evidence and with leave of court, plaintiff filed a second amended complaint, of which Count I alleged "that the defendant had the right to control the job and was in charge of the job, and that it violated the Structural Work Act as set out in Chapter 48, Section 60 . . . and Section 64 . . . in one or more of the following particulars:

"(a) The stay, support or other mechanical contrivance used in the alteration of a building or structure was not placed and operated as to give proper and

397

adequate protection to the life and limb of any person engaged thereon;

"(b) Failed to have a safe and proper scaffold, stay, support, or other suitable device not less than sixteen feet or more below the area on which the plaintiff was working, although the said work was being performed at a height in excess of 32 feet;

"(c) Had an area covered with steel beams and structures 41 feet below the area of the stay or support on which the plaintiff was then working, so that upon striking the said beams the violence was increased."

Later plaintiff added an additional allegation:

"(d) Failed to provide the plaintiff with a float upon which to support himself while doing the work required of him."

At the close of all the evidence, defendant's motion to strike the allegations of each of the subparagraphs and to withdraw each from the consideration of the jury was denied and, over defendant's objections, the jury was instructed as to both sections of the statute and all of the subparagraphs.

Considered first is defendant's contention "that upon the undisputed facts in this record neither statute nor the allegations of the subparagraphs were applicable."

Defendant states that the column from which plaintiff fell was a permanent structure of the building under construction, and that no "scaffold" or "float" (a working platform) was used.

Defendant asserts that it has been settled by two recent Appellate Court decisions that paragraph 60 does not apply to a permanent structure of the building, or require the furnishing of a scaffold. The two cases, in both of which leave to appeal has been denied by our Su-

preme Court, are Parizon v. Granite City Steel Co., 71 Ill App2d 53, 218 NE2d 27 (May 18, 1966), and Bohannon v. Joseph T. Ryerson & Son, Inc., 72 Ill App2d 397, 219 NE2d 627 (June 28, 1966).

In Parizon, the plaintiff slipped and fell from the completed portion of the roof of a building under construction, as he was carrying a corrugated sheet to be installed as part of the roof. He sued both the contractor and the owner. In reversing judgments against both defendants, the court stated (p 60):

> "This appeal directly raises the issue of whether or not the Structural Work Act applies to those circumstances where men work upon permanent structures. The pleading, as the case went to the jury, alleged that it was necessary to use scaffolds and that the roof of the building was so used. We understand that there is no controversy as to the fact that the sheets of roofing were permanently affixed and installed as a part of the building at the time the several workmen were upon the roof placing and fastening the next row of sheets.

> "If the allegations of the pleading that it was necessary to use a scaffold are taken to mean that there was a statutory duty to erect and construct a scaffold for the work being done upon this occasion, the recent authority of opinions of our courts are to the contrary. It has been held in Miller v. De Witt, 59 Ill App2d 38, 208 NE2d 249, and Bradley v. Metropolitan Sanitary Dist., 56 Ill App2d 482, 206 NE2d 276, that section 1 of the Structural Work Act does not undertake to state or provide when or under what conditions a scaffold is required to be erected as a matter of statutory duty."

After reviewing the common meaning of the term "scaffold," it is said (p 62):

399

"[I]t is difficult to conclude that the intent or understanding of the Legislature was that the language of the Act applied to a fixed permanent structure, or that such a structure, or its parts, would be a scaffold or platform within the meaning of the Act.

"No cases from our Supreme Court have been cited and we have found none which hold a permanent structure, or, as in this case, the roof of the building as permanently affixed is to be treated as a scaffold or as an item of the several categories set forth in section 1 of the Act. On the contrary, the several cases of our Appellate Courts cited and referred to, or developed through our own investigation, emphasize that the Act is applicable to the temporary structures erected for use as an incident to the construction work."

In Parizon (p 69), the court also considered the contention "that this case should be viewed in the light of the fact that the plaintiff was engaged in an ultrahazardous form of work," and noted, "there is a distinction between a cause of action under the Structural Work Act and a cause of action for failure to provide a safe place to work," and stated (p 70):

"[T]he rule of liberal construction does not permit either restriction or enlargement of the meaning of the terms of the statute, and it is not within the province of the court to take from, or enlarge, the meaning of a statute by reading into it language which will, in the opinion of the court, correct any supposed omission or defect. Rather, we must seek the construction of statutory language in the usual meaning attached to the words used. . . . In distinction, we are here asked to add new connotations to the language of a statute which does not require that

scaffold or comparable appliances be used, and which specifies the instrumentalities, each with its own use, and an apparent usual meaning, none of which suggest or connote a structure of the sort now at issue."

Defendant notes that in Bohannon (72 Ill App2d 397, 219 NE2d 627), the plaintiff was standing on wire mesh, a permanent part of the structure. He fell when the hog or pen rings holding the wire parted, causing him to fall through the opening thus created in the wire mesh. There the court concluded (p 412) :

"In the case at bar, we find that the struts were a permanent part of the building. Therefore we hold, in accordance with Parizon v. Granite City Steel Co. . . . that a permanent structure is not a structure within the terms of the Illinois Structural Work Act. Furthermore, to resolve any conflicts that may exist between the case at bar . . . and the dissenting opinion in Parizon . . . , we find there was no evidence submitted in the instant case to show that the struts were used on prior occasions other than to support the roof of the building and that, therefore, the use of the struts as a scaffold was not contemplated when they were installed. As we pointed out above, the wire mesh was part of the work in progress and, therefore, not a structure within the Illinois Structural Work Act."

Defendant argues that Parizon and Bohannon, and the cases cited therein, "compel the conclusion that the column was not 'a stay, support or other mechanical device employed in the erection' of the building. . . . [T]hese cases hold that the *absence* of a scaffold or float is not a violation of Sec 60; that statute merely provides that *if* a scaffold or similar contrivance is 'erected or constructed . . . for the use in the erection . . . of any . . . building' it shall be erected in a safe, suitable and

proper manner, etc. The allegations of subparagraphs (a) and (d) do not charge violations of Sec 60."

On the issue of whether paragraph 60 applies to permanent structures, plaintiff contends the vertical steel column was furnished and used as a scaffold, support or mechanical contrivance within the meaning of the following language of paragraph 60:

> ". . . all scaffolds, hoists, cranes, stays, ladders, supports, or other mechanical contrivances erected or constructed . . . for the use in the erection, repairing, alteration, removal or painting of any house, building, bridge, viaduct, or other structure . . . ."

Plaintiff argues, "Several things are clear in the case at bar. The column, the rivet heads and spud wrenches were the only means *intended and furnished* plaintiff Spiezio for his use in climbing the column to make the necessary connection in the course of the erection and construction of the addition to defendant's generating station. And Spiezio so used them."

Plaintiff asserts, "The Act itself nowhere excludes, expressly, or even impliedly, permanent structures from its sweep. As already noted, even a permanent structure may afford temporary support to a workman. He may use the structure temporarily as a scaffold, support or similar mechanical contrivance, in any event."

Plaintiff's authorities include: Gannon v. Chicago, M., St. P. & P. Ry. Co., 22 Ill2d 305, 317, 318, 175 NE2d 785 (1961):

> "[In considering] the construction of this act, we must apply the legal axiom that the words of the statute should be construed to give effect to the legislative intention, which must be ascertained not only from the language of the entire act, but from

the evil to be remedied and the object to be attained.

". . .

". . . As its title signifies, the Scaffold Act endeavored to give protection to workmen engaged in structural work by requiring certain standards for such work and by providing both criminal penalties and civil liability for failure to comply therewith. The statutory purpose . . . was 'to prevent injuries to persons employed in this dangerous and extra-hazardous occupation, so that negligence on their part in the manner of doing their work might not prove fatal.' It was held, therefore, that the doctrines of assumed risk and contributory negligence had no application to the Scaffold Act, since it was patterned after the mining statute, which had been similarly construed."

Louis v. Barenfanger, 81 Ill App2d 104, 226 NE2d 85 (1966), where it is said (p 109) :

"As stated in Thon v. Johnson, 30 Ill App2d 317, 174 NE2d 400, 'There is little authority in Illinois as to what does and what does not constitute a scaffold within the meaning of the statute,' and whether an object or instrumentality is a scaffold or support must be determined on the facts in each case. Thus an overhead crane (Bounougias v. Republic Steel Corp., 277 F2d 726), a shovel extension mounted on a tractor (Oldham v. Kubinski, 37 Ill App2d 65, 185 NE2d 270) and a plank laid across a concrete form (Frick v. O'Hare-Chicago Corp., 70 Ill App2d 303, 217 NE2d 552) were held to be scaffolds under the facts presented in those cases. . . . .

". . . Obviously the failure to properly place a scaffold or support is as much an actionable violation of the Structural Work Act as is the failure to properly construct, erect or operate a scaffold or mechanical contrivance."

Koepp v. National Enameling & Stamping Co., 151 Wis 302, 139 NW 179 (1912), where it is said (pp 184, 186):

"Any combination for use in doing any kind of work mentioned in the statute where the servant is dependable thereon for support, in place of an ordinary surface, such as the ground or floor, is a mechanical contrivance. The Legislature, in the combination of words, 'scaffolding, hoists, stays, ladders or other mechanical contrivance,' viewed in a broad remedial sense in favor of employes, left little, if anything, uncovered which may be used in the work mentioned, where required to be done beyond the reach of one standing on an ordinary surface.

". . .

"The same is true of the term 'scaffolding' and the words 'mechanical contrivance.' Each is to be given the broad comprehensive meaning necessary to accomplish the manifest purpose of the act."

Evans v. Portland Ry. Light & Power Co., 66 Ore 603, 135 P 206 (1913), where it is said (p 208):

"Until the trestle was used for the purpose for which it was built and as long as it was employed as a means of erecting the power house, it was pro hac vice a scaffolding, staging, or, as denominated by the court, a platform upon, along and over which the defendant's foreman in charge of the work directed the plaintiff to perform his labor."

404

■

1967–1968 Supplement to 35 Am Jur, Master and Servant, § 195, p 625:

"On the other hand, when the injury is the result of the use by the workman, for purposes of personal support, of a device which has not been constructed with the intention that it should be so used, the courts have been reluctant to hold that such devices are scaffolds. . . . Where the device being used as a scaffold was, or was intended to be, a permanent part of the structure being worked upon, the rule seems to be that if the apparatus in question was being put to a temporary use as a support for workmen at the time of the accident, it is a scaffold, regardless of its ultimate use as a part of the permanent structure. Another criterion used by courts to determine whether a particular structure is a scaffold is the element of danger involved in its use and whether this was the danger which the legislature was attempting to alleviate in enacting the statute requiring safe scaffolds."

■ Considering the view this court takes of the facts of this case, we do not believe that it would be useful to attempt to reconcile the various pronouncements made in defendant's authorities. We do not agree with defendant's contention that the permanent character of a device used as a support or platform necessarily places a case outside of the application of the Structural Work Act. We do agree that the statutory language "is not to be broadened to include every place at or upon which a person may work"; also, that any place where a workman chooses to stand does not become a scaffold within the meaning of the statute.

■ In our opinion, the rule to be applied here should be that if the apparatus was intended to be and was put to temporary use to provide footing or support above

405

the ground or floor for workmen at the time of the occurrence, it was a scaffold and within the purview of the Scaffold Act, regardless of whether the apparatus or device was, or was intended to be, a permanent part of the structure being worked upon. 35 Am Jur, Master and Servant, § 195. This, in substance, is the rule this court endeavored to apply in Frick v. O'Hare-Chicago Corp., 70 Ill App2d 303, 217 NE2d 552 (1966), where it is said (p 309):

> "On trial, in the absence of contrary evidence, the testimony of plaintiff, if consistent with the extracts taken from his deposition, should be sufficient to show that the plank was intended to be and was used as a scaffold, support or mechanical contrivance in connection with the construction of the addition, and within the purview of the Scaffold Act."

Plaintiff's injuries were not "the result of the use by the workman for purposes of personal support, of a device which ha[d] not been constructed with the intention that it should be so used." Plaintiff's co-workers testified that it was the customary and usual way in structural steel construction to use a steel column being permanently installed as a temporary device to provide footing or support above the ground or floor for structural steel workers. If so, such a custom and use here supplied the intention to use the steel column as a scaffold, support or mechanical contrivance in connection with the construction of the addition and within the purview of paragraph 60 of the Scaffold Act.

Plaintiff also contends that paragraph 64 of the Scaffold Act (Ill Rev Stats, c 48), was violated by defendant. The words in that paragraph are "any water pipe, standpipe, tank, smokestack, chimney, tower, steeple, pole, staff, dome or cupola." Plaintiff asserts that the column was such a high perpendicular structure, involving the

same perils attendant or associated with working thereon, as to come under paragraph 64 of the Act.

As to the charge of violation of paragraph 64, defendant argues, "The express language of the statute compels this interpretation; it requires *secondary* scaffolding 16 feet below *only* when there is being used a *'working'* scaffold, staging, swing, hammock, support or *temporary* platform.' . . . Here, no 'working' scaffold was in use, and no secondary or subscaffold was required by section 64. Section 64 has no application whatever to the facts of this record. We submit that as in Parizon, Bohannon and Bradley, there was a failure to bring the case within any provision of the statute relied upon."

Plaintiff argues that "it is inconceivable that a structural column extending some 80 feet above ground straight up into the air, and more than 40 feet above any platform or planking, just as any 'tower, steeple, pole, staff,' should not fall within the general classification so clearly applicable, even though the term 'column' is not expressly used. Obviously what was intended to be protected are workmen engaged in the perilous work of steeplejacks on high perpendicular or vertical structures. This is the thrust of the examples used. . . . It follows from the remainder of that provision, requiring a proper scaffold or support or other suitable device to be erected at a certain minimum distance below plaintiff, that one should have been so erected, and that the failure to do so was a violation."

■ We agree with plaintiff, and in our opinion the purpose of paragraph 64 was to protect workmen engaged on high perpendicular or vertical structures and should be construed so as to include structures, complete or incomplete, temporary or permanent, which fall within the purview of the general class outlined in paragraph 64.

■ ■ We conclude that the question of the applicability of the Scaffold Act, paragraphs 60 and 64, and the

question of whether these provisions were violated by defendant on the evidence in the record were for the determination of the jury.

Considered next is the issue of whether defendant, as owner, was "in charge of" the work of Bethlehem so as to be guilty of a "wilful violation" of the statute (Ill Rev Stats 1957, c 48, ¶ 69). The plans and specifications for the job were prepared by a consulting firm of engineers, Sargent & Lundy. Defendant hired no general contractor. Contracts were made directly by defendant with a large number of prime contractors, including Bethlehem. Each contractor had a specific function or job to accomplish in connection with the new construction.

Plaintiff's evidence on this issue included the reading into evidence of the deposition of Earl Jacobsen, who was a retired employee of the defendant at the time of the trial. He was called by plaintiff and testified under section 60 of the Civil Practice Act as an adverse witness, over defendant's objection. Jacobsen, prior to his retirement, had been employed by defendant as a station construction engineer. In 1957 he had charge of defendant's office "in connection with the construction of the unit, which included the construction inspectors, supervisors and clerical help for paper work." He stated, "The construction began in the spring of 1957. At the time it began, I had a group of men under me, referred to as the station construction force. There were six in the construction force itself, five in the clerical force and four watchmen or gatemen. Fifteen men in addition to myself. I was in charge of this group of men at the site. . . . From the time this construction began, we would get reports weekly, not necessarily from the contractors engaged at the site but my construction supervisors would list the number of men that were working with the contractor so we would know what the progress might be. I, myself, and those working under me observed the progress of the work by being there daily."

Jacobsen was familiar with the Bethlehem Steel contract and testified regarding it. It contained standard specifications and standard conditions, which included:

"The Contractor agrees that the Work shall be done under the general supervision and to the satisfaction of the Owner's Station Construction Department, which is hereinafter referred to as the 'Engineers.'

"The Contractor agrees to observe and abide by all the terms and conditions of the Owner's General Conditions."

The "General Conditions" included the following:

"9. Safety of the Work. The Contractor agrees to carry on the Work in a proper, safe and secure manner with the utmost care so as to prevent loss, injury or damage to the Owner's property or the property on the Premises and/or surrounding property, and so as to prevent danger to the lives or persons of individuals and, if in the opinion of the Engineers the Work is not being so carried on, they may order the Work stopped immediately and not resumed until, in their opinion, proper means and methods have been adopted by the Contractor to insure the carrying on of the Work so as to prevent such threatened loss, injury, damage, or danger. The Owner reserves the right, however, to order the Work stopped whenever the Work interferes or threatens to interfere with the operation of the Owner's equipment until such interference is eliminated. All equipment used on the Premises shall be in first class condition and any equipment which, in the opinion of the Owner or the Engineers, shall be considered inadequate or unsafe, shall be removed at the expense of the Contractor. . . . All safety barricades and planking

409

shall be installed to the satisfaction of the Engineers."

Jacobsen also testified, "The fact is that neither I nor any man under my supervision in the station construction department gave instruction to the superintendent of the Bethlehem Company as to the manner in which the steel should be erected. We don't tell any superintendent how to do his work. . . . With respect to paragraph [9] of the General Conditions, 'Safety of the Work,' I don't recall that I or any of the members of my force took exception to the conduct of Bethlehem Steel with reference to the safety of the work under that paragraph. . . . [N]either I nor any of the members of my force had occasion at any time to direct Bethlehem Steel to remove or discharge or disqualify any of its employees on the job."

Plaintiff's evidence on this issue included the following testimony: "There weren't any Commonwealth Edison employees around the scene of the accident at the time it occurred. There were Commonwealth Edison employees around this particular area at the time the other six or eight men climbed this column in order to bolt up the lower beam; they were on the job there roaming around looking at how the job is progressing. They weren't giving any instructions to the men climbing the column." Also, "During the period I was there I had occasion to see representatives of the Edison Company. They had someone there all the time. I would see them on the job each day. I don't remember seeing them talk to my superiors."

Defendant argues, "Tested by proper standards, it is clear that Edison was not 'in charge of' Bethlehem's work so as to be charged with a 'wilful violation' of the statute in any of the respects charged here. There was no evidence that Edison knew anything about the practice of, or the manner of, climbing vertical columns such as this;

there is no evidence to charge Edison, a producer of electricity, with a knowledge of proper structural steel erection practices superior to that of Bethlehem, one of the leading companies in this field. This was not a condition, or a method of doing the work, which was of long-standing, and could have been observed by Edison, complained of to Bethlehem, and corrected; it was a method of climbing the column voluntarily chosen by plaintiff (he would not have had to cross to the other side of the column if he had climbed the face of the column on which he was to make the connection), and within a very few minutes at the most, plaintiff had fallen. Edison was not shown to have had any knowledge of the fact, or the likelihood, of plaintiff's climbing the column, or to have had any opportunity to stop plaintiff, or to stop all the work, until some other method of connecting the beam was undertaken."

Defendant further argues, "We submit that upon this *evidence*, which was undisputed, Edison was not sufficiently 'in charge of' Bethlehem's work to have been able to prevent plaintiff from climbing the column in the manner he did, if that manner of performing the work was a violation of the statute in any of the respects alleged." Authorities discussed by defendant on this issue include: Gannon v. Chicago, M., St. P. & P. Ry. Co., 22 Ill2d 305, 175 NE2d 785; Larson v. Commonwealth Edison Co., 33 Ill2d 316, 211 NE2d 247 (1965); and Miller v. DeWitt, 37 Ill2d 273, 226 NE2d 630 (1967).

Plaintiff argues, "Defendant acted as its own general contractor, maintained its own project engineer in the field to represent it, hired the numerous and various prime contractors including Bethlehem Steel, and approved the suppliers and subcontractors of Bethlehem Steel. It further maintained liaison with the prime contractors through its construction department headed by its project engineer and, through its consulting engineers

Sargent & Lundy, received progress reports, and reserved the right to make alterations or corrections in the work. It further reserved all other powers of supervision over the work and Bethlehem's employes, including the right to direct safety requirements and practices in conformity with safety laws."

Our examination of this record indicates that the basic facts are similar to those in Larson v. Commonwealth Edison Company. In both cases it appears that the same type of contract, including similar "General Conditions," was used. Therefore, the pronouncements of our Supreme Court in Larson are pertinent here. In Larson, it is said (p 321) :

> "The controlling section of the statute, which is section 9, makes no mention of either the retention or exercise of control and supervision, but imposes a duty of compliance, and liability for either wilful violation or a failure to comply with the terms of the act, upon 'any owner . . . *having charge of* the erection . . . [or] alteration . . . of any building . . . [or] other structure . . . .' Ill Rev Stats 1957, c 48, par 69.

> ". . .

> "While it may be conceded that some of the decisions in this jurisdiction involving the Scaffold Act appear to have equated 'having charge' with 'supervision and control' in varying degrees, it is our opinion the language of the statute, and the legislative intent it reflects, do not permit the conclusion that the terms are the inflexible and unbending legal equivalent of the other. The term 'having charge of' is a generic term of broad import, and although it may include supervision and control, it is not confined to it. . . . Thus, while the actual exercise of

supervision and control over the work and the persons doing it, or the retention of the right to so supervise and control, may be factors bearing on the ultimate factual question of whether an owner is 'in charge,' they are not necessary or conclusive factors, nor is either made a sine qua non for liability under the statute. Rather, consistent with its beneficent purpose of preventing injury to persons employed in the extra-hazardous occupation of structural work, the thrust of the statute is not confined to those who perform, or supervise, or control, or who retain the right to supervise and control, the actual work from which the injury arises, but, to insure maximum protection, is made to extend to owners and others who have charge of the erection or alteration of any building or structure.

"In the Gannon case (22 Ill2d 305,) where it was expressly noted that the owner involved had 'exercised no control over the manner in which the work was being done,' (p 307), we held that an owner must have some direct connection with the operations, over and above mere ownership or the employment of an independent contractor, and indicated that the question whether the particular connections and activities in a given case were such that an owner could be deemed to have charge was a question of fact for the jury to determine."

 Following the guidelines of Larson, we conclude that the question of whether defendant's "particular connections and activities" in the instant case were such that defendant, as an owner, could be deemed to have charge was properly a question of fact for the jury to determine.

Considered next is defendant's contention of prejudicial errors. The first error asserted is, "The court erred

413

in refusing to withdraw from the jury the allegations of violation of each section of the statute, and in submitting both sections of the statute to the jury in the instructions." In view of our conclusions that paragraphs 60 and 64 are applicable to the facts shown in this record, we find no error here.

Defendant next asserts, "The court erred in admitting opinion testimony by plaintiff's witness Botica as to supposed violations of the Structural Work Act." Joseph J. Botica, a structural ironworker superintendent, testified as to the "customs and practices in the steel work industry," including practices concerning platforms and planking. He had followed the trade since 1941 and had worked as superintendent on jobs in this community.

Defendant contends, "At the trial below—where the ultimate jury issue was what was 'safe,' 'suitable,' 'proper' and 'adequate,' under the plaintiff's theory—the trial court, over defendant's objections, admitted testimony by the plaintiff's witness Botica, a structural ironworker, which persistently violated the ultimate issue rule as applied by the Illinois courts. Ostensibly, Botica was asked his opinions as to certain 'customs' in structural steel erection and, through a hypothetical question and subsequent inquiries for his supporting 'reasons,' as to whether there could be a 'causal connection' between the 'manner in which the work was being done' and the injury sustained by the plaintiff. However, a careful review of Botica's testimony will reveal that this was a deliberate subterfuge to furnish a device through which Botica's opinions on the ultimate issues could be submitted to the jury by an 'expert.' . . . Botica stated his conclusions regarding *'adequate* facilities' *'to protect his life and limb';* regarding the need for other methods than the method used, to provide 'a *safe* working area'; the need for a platform at the top of the column, to provide *'adequate'* time and 'a relaxed area to make the necessary

connection'; the need for a properly placed float on the column to be 'on the *safe* side'; the need for *'adequate* ladders on the job'; the need for planking every second floor *'to protect life and limb'* . . . ."

Defendant's authorities on this point include Allen v. Yancy, 57 Ill App2d 50, 206 NE2d 452 (1965), where it is said (p 60):

> "Our courts have held that admission of this kind of testimony is error. In order to preserve the independence of the jury, it has been held that a witness may not give his opinion on an ultimate issue in the case."

As to Botica, plaintiff contends, "Botica's testimony as to custom and practice in the industry, such evidence was relevant in determining the 'standard of care,' that is, what was proper conduct here. In the case at bar it was furnishing 'safe, suitable and proper' scaffolding or support. Such testimony 'illustrates what is feasible, and suggests a body of knowledge of which the defendant should be aware.' " Darling v. Charleston Hospital, 33 Ill2d 326, 211 NE2d 253 (1965).

■ We have examined Botica's testimony in the light of defendant's objections. Botica's conclusions regarding "proper and adequate facilities," "protection for life and limb," "safe" and the like might be considered objectionable under the ultimate issue rule. However, in supplying expert opinion upon custom in high steel construction in which considerations of safety are routine, a witness would have difficulty in expressing himself without the use of those terms. In short, we believe the use of the particular words employed by Botica did not have the effect of rendering the jury less independent in its consideration of the ultimate issues of the case. Botica's testimony was proper in that it informed the jury of various industry practices and customs, and it was not

415

prejudicial because it also informed the jury that the motivating consideration behind certain of those practices was the safety of the workmen. We conclude that the defendant was not prejudiced by the testimony objected to.

Finally, defendant contends, "The court erred in defining the phrase 'having charge of' in its instructions." Instruction No. 16, given to the jury stated:

> "The term 'having charge of' as used in these instructions is a generic term of broad import; it may include supervision and control, but it is not confined to it.
>
> "In determining whether an owner is 'in charge,' amongst the factors which might be considered are the retention of the right to control or the actual exercise of control.
>
> "Whether a party is 'in charge of' the work under this Statute is a matter for you to determine under all the facts and circumstances."

Defendant maintains the giving of this instruction was prejudicial error, and it comes within the pronouncements of the Supreme Court in Larson v. Commonwealth Edison Company. There the court said (p 323):

> "It is to be gathered from the opinion of the Appellate Court, and the arguments of Edison in this court, that justification for the instruction given in this case may be found in the need to provide jurors with a definition of the statutory words 'having charge of.' We do not believe such a need exists. It is well established that the meaning of words, used in their conventional sense, need not be defined or explained in giving instructions to the jury. . . . The term 'having charge of' is one of common usage and understanding, and it is our opinion that further

attempt at definition can only lead to confusion and error."

Defendant argues that the instruction given here emphasizes factors favorable to plaintiff's contention, which factors, according to the Supreme Court, "are not necessary or conclusive factors, nor . . . a sine qua non for liability under the statute" and "thus to focus the jury's attention on only some of the factors which the jury must consider on this issue was error."

Plaintiff contends, "The instruction does not purport to define the term 'having charge of.' It does not definitively include elements to the exclusion of others, nor does it inform the jury that the retention of the right to control or the actual exercise of control is sufficient to fix liability under the Act. . . . The instruction here merely incorporates a reference to some of the factors which the jury properly could consider in determining whether defendant was such an owner, within the meaning of the Scaffold Act."

We believe that our Supreme Court in Larson v. Commonwealth Edison Company strongly indicated that the court found no justification or need to define, explain or to provide jurors with a definition of the statutory words "having charge of." Therefore, the giving of instructions in this area requires serious consideration and may lead to confusion and prejudicial error.

█ █ The instruction here appears to be based on language used by the Supreme Court in the Larson opinion. We are aware that it is not a recommended practice in this state to convert language of judicial decisions into instructions. (Bartosh v. Ryan, 344 Ill App 214, 219, 100 NE2d 330 (1951).) It was not a peremptory instruction, and we do not believe that the instruction misled or confused the jury in this case. We find no prejudicial error in this instance.

417

For the reasons stated, and finding no reversible error in this record, the judgment of the Circuit Court of Cook County is affirmed.

Affirmed.

BURMAN, P. J. and ADESKO, J., concur.