Lawrence Juliano, Plaintiff-Appellee, *v.* Joseph Oravec *et al.*,
Defendants-Appellants.

(No. 54414;

First District—February 4, 1972.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago, (Leonel I. Hatch and D. Kendall Griffith, of counsel,) for appellants.

James A. Dooley, of Chicago, for appellee.

Mr. PRESIDING JUSTICE LORENZ delivered the opinion of the court:

Plaintiff brought this action to recover for personal injuries which resulted from an accident at a construction site. In his amended complaint and the amendment thereto, plaintiff alleged that defendant's negligence and his willful violation of Ill. Rev. Stat. 1959, ch. 48, pars. 60, 61 and 62,

parts of the Structural Work Act,[1] proximately caused the injuries of which plaintiff complains. During trial the negligence count was withdrawn. A jury verdict was rendered against defendant and damages were assessed in the amount of $75,000.00 and judgment was entered on the verdict. On appeal defendant contends: (1) that the Structural Work Act does not apply to this occurrence; (2) that plaintiff has failed to prove an essential element of his case; and (3) that the verdict was contrary to the manifest weight of the evidence.

The evidence presented at trial may be summarized. Defendant was a general contractor engaged in the construction of two buildings at 5237 and 5239 West Warwick Avenue in Chicago. The structures, both two-story buildings containing two apartments, were built on two adjacent lots owned by defendant. He planned to and did sell the properties when the buildings were completed. As general contractor, defendant obtained building permits and supervised the work of the subcontractors. He would go to the building site once or twice daily to check the progress, inspect the work done and consult with the various subcontractors con-

---

[1] The pertinent parts of the Structural Work Act read as follows:

"60. SCAFFOLDS, CRANES, LADDERS, ETC.—ERECTION AND CONSTRUCTION. § 1. That all scaffolds, * * * stays, * * * supports, * * * erected or constructed by any person, firm or corporation in this State for the use in the erection, * * * of any house, building, * * * shall be erected and constructed, in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon, * * *.

61. INTERMEDIATE SUPPORTS FOR JOISTS, ETC. § 2. If in any house, building or structure in process of erection or construction in this State (except a private house, used exclusively as a private residence), the distance between the enclosing walls, is more than twenty-four (24) feet, in the clear, * * * the floors in all such houses, buildings or structures, in process of erection and construction, shall be designed and constructed in such manner as to be capable of bearing in all their parts, in addition to the weight of the floor construction, partitions and permanent fixtures and mechanisms that may be set upon the same, a live load of fifty (50) pounds for every square foot of surface in such floors, and it is hereby made the duty of the owner, lessee, builder or contractor or subcontractor, of such house, building or structure, or the superintendent or agent of either, to see that all the provisions of this section are complied with.

62. PLACARD STATING LOAD PERMITTED—VERIFICATION. § 3. It shall be the duty of the owner of every house, building or structure (except a private house used exclusively as a private residence) now under construction or hereafter to be constructed, to affix and display conspicuously, on each floor of such building during construction, a placard stating the load per square foot of floor surface, which may with safety be applied to that particular floor during such construction; * * *. It shall be unlawful to load any such floors or any part thereof to a greater extent than the load indicated on such placards, * * *."

cerning the acceptability of their work. Although on this particular job defendant only gave the carpentry subcontractor special instructions on the size of the medicine cabinets, he could have rejected any carpentry work which did not conform to the plan.

On the afternoon of June 2, 1961 plaintiff, an apprentice plumber, together with two journeyman plumbers, was working on the second floor of one of the abovementioned buildings. As was customary in the construction industry the tradesmen depended upon subflooring for their support as they worked in this building which was under construction. As an apprentice plumber, plaintiff did the bidding of the journeymen, obtained materials for them and watched them in the performance of their trade. Pursuant to his duties plaintiff walked over the subflooring to a portable furnace which weighed 10 to 15 pounds and was one foot high and was located about twenty feet from the place where he was working. There he obtained a ladle full of molten lead which was to be used in the making of a pipe joint. As he returned, his foot went through the subflooring. As he fell, his elbow hit the subflooring causing the molten lead to be hurled from the ladle into his eye and onto his arm. Plaintiff's co-workers went to his aid and immediately took him for medical treatment.

The subfloor is an initial and permanent part of the building. In the building industry subflooring may be termed as a "stay." It is constructed by laying one inch by eight inch spruce boards side by side.[2] The lumber used in the construction of the subflooring of these particular buildings was that type commonly used for subflooring in the building industry at the time. It was not the least expensive lumber which could have been used and its strength varied with thickness, moisture conditions and the presence of knots. Although knots were present in this lumber, knots may make a board stronger. Neither plaintiff, his co-workers, defendants, nor any of the other witnesses noticed anything unusual about the subfloor before the incident. Plaintiff himself testified that the subfloor looked like that of any other building under construction. Both plaintiff and one of his co-workers testified that the hole which plaintiff's foot went through was jagged in appearance. The carpentry subcontractor examined the lumber as the subfloor was being constructed and found nothing unusual. Defendant visually inspected the lumber for thickness before the subfloor was constructed. There were no signs posted which would have informed the workmen of the load which the subfloor was designed to carry or could have safely carried.

A structural engineer testified that a floor which is capable of sup-

[2] A board which is nominally one inch thick is actually slightly less than one inch in thickness as a finished product.

porting a live load of fifty pounds per square foot, *i.e.*, one which is capable of supporting fifty pounds per square foot evenly distributed over its area, is adequate to support a human being.

*Opinion*

For plaintiff to retain his judgment on this appeal the following questions must be answered affirmatively. Do any of the sections of the Structural Work Act relied upon by plaintiff apply to the instant case? Did defendant willfully violate an applicable section? Was plaintiff's injury proximately caused by such violation?

(1) First, it must be determined whether any of the provisions of the Structural Work Act relied upon by plaintiff are applicable to this case.

Section 60 enumerates a number of devices which, if used in the erection of a house, building or other structure, must be erected and constructed in a safe, suitable and proper manner in order that proper and adequate protection be given to the life and limbs of persons employed or engaged thereon. Defendant would have us believe that an integral and permanent part of a completed structure would, by its very nature, not be within the Structural Work Act. In support of this theory he has cited many Illinois Appellate Court decisions. Those cases are, however, of little use to defendant in light of the Supreme Court's decision in *Louis v. Barenfanger* (1968), 39 Ill.2d 445, 449, *cert.* denied (1968), 393 U.S. 935. There the court said that a permanent structure is not excluded from the broad coverage of the act in spite of the fact that it was temporarily used as a stay or support. See also *McGinnis v. Cosmopolitan National Bank & Trust Co.* (1969), 114 Ill.App.2d 113, 116 and *Bennett v. Musgrave* (1970), (Ill.App.2d), 266 N.E.2d 128, 131.

■■ Defendant also contends that the subflooring could not be considered within the purview of Section 60 because it was not constructed "for use in the erection, repairing, alteration, removal or painting of any house, [or] building * * *." This contention, however, is contrary to the facts brought out at trial. Defendant, as general contractor, the subcontractors and the tradesmen all used the subfloor for support as they inspected and constructed the buildings on Warwick Avenue. The Supreme Court, in *Louis v. Barenfanger* implied that even though the primary purpose of a device or instrumentality is that it be an integral part of the finished structure, it may have the secondary purpose of being used in the erection of that structure. Thus, a permanent part of a finished structure will be subject to the provisions of the Structural Work Act if it is used in the erection, repairing, etc. of any house, building, bridge, etc. The determining factor is the use to which a contrivance is put, not whether it is permanent or temporary.

■■ Our attention is next directed to the question of whether or not a

subflooring may be characterized as a "scaffold." The subflooring was used as a support for tradesmen as they worked inside the structure. They depended upon it for their safety as they plied their trade. It seems difficult to comprehend the difference between a scaffold, erected for the sole purpose of providing a platform from which a tradesman discharges his duties and a subfloor on which the same tradesman stands to discharge his duties in the construction of the same building. In either situation he is using a "scaffold" for aboveground support as he does his job. This interpretation follows the liberal construction to be afforded this act to effectuate the purposes of the statute. (*Schultz v. Henry Ericsson Co.* (1914), 264 Ill. 156, 164.) Therefore, it is immaterial whether the apparatus used was a temporary or permanent part of the structure, because the apparatus provided an aboveground footing or support for workmen, it falls within the purview of Section 60 of the Structural Work Act. *Spiezio v. Commonwealth Edison Co.* (1968), 91 Ill.App.2d 392, 405-406.

Next, the applicability of Sections 61 and 62 must be considered. Section 61 requires that the floor of certain types of structures be capable of bearing a live load of fifty pounds for every square foot of surface. Section 62 requires owners of certain types of structures under construction to display placards stating the load per square foot of floor surface which may be safely applied to the floor of that structure. Both sections are applicable to the construction of houses, buildings and structures "except a private house used exclusively as a private residence." Defendant contends that the buildings he was constructing come within the statutory exceptions.

The buildings, upon their completion, were to be two-story apartment buildings with each floor designed as a separate, private residence. Defendant owned the land upon which the buildings were constructed and hoped to sell them shortly after completion.

■■ In an attempt to convince this court that the buildings fall within the exception carved out of Sections 61 and 62, defendant urges us to consider *Leverich v. Roy* (1949), 338 Ill.App. 248. In that case the court construed the terms "one dwelling house" and "private dwelling" found in a restrictive covenant to allow a single family dwelling to be remodeled into a two apartment building. In doing so the court took note of the fact that such restrictions should be construed broadly to foster free use of property unhindered by restrictions. This court however is bound to liberally construe the language of the Structural Work Act to further the purposes of the legislature in its attempt to protect workmen engaged in extrahazardous activity. (*Schultz v. Henry Ericsson Co.* (1914), 264 Ill. 156, 164.) The construction advocated by defendant

would run counter to the general legislative intention. Additionally, defendant urges us to consider *Jones v. Smith* (D.C. of Virg. Is., 1965), 241 F.Supp. 913, a case which states that the term "private residence," as distinguished from the term "single family dwelling," includes an apartment house.

Cases construing the terms similar to those used in the Structural Work Act reveal a marked lack of agreement. Such is indicated by a comparison of *Jones v. Smith* with *Koch v. Gorruflo* (1910), 77 N.J. Eq. 172, 75 A. 767. In *Koch* the court noted the distinction between a private residence and an apartment house. Some enlightenment may be found by considering the discussion in *Fox v. Sumerson* (1940), 338 Pa. 545, 13 A.2d 1, where the court considered the meaning of the term "private dwelling house." The court at 13 A.2d 2 stated:

"The distinction between a private dwelling house or a private residence on the one hand and a house built or occupied as a residence for two or more families is quite obvious. In one case it is single, private, and personal; in the other it is a sort of tenement affair. While the families occupy separate apartments distinct from each other, they are not private residences as the term is ordinarily understood.

\* \* \*

The term 'private' \* \* \* means limitation for use privately, that is, apart from others, or in other words, singly by one family."

That discussion is consistent with the meaning attributed to "private" in *Webster's New International Dictionary of the English Language*, 2nd ed. where at page 1969 the term is defined as meaning:

"belonging to, or concerning, an individual person, company, or interest; peculiar to oneself; unconnected with others; personal; one's own; not public; not general; separate; \* \* \*."

After considering the meanings attributed to "private" in a light consistent with the intent of the legislature of this State we conclude that a two apartment building does not come within the exception created in Sections 61 and 62 of the Structural Work Act.

■■ Section 62 of the Act requires the affixation of a placard on each floor of a building under construction. This placard is required to state the load per square foot of floor space which may safely be applied to a particular floor. The section also states that it is unlawful to load a floor to a greater extent than that which is indicated on the placard. In light of the uncontroverted evidence that no placards of this nature were displayed at the Warwick Avenue building site it would seem that defendant violated the Act. A reading of Section 61, however reveals that all floors in that type of structure described in Section 62 must be capable of bearing a minimum live load of fifty pounds per square foot if the

distance between the enclosing walls is more than twenty-four feet. If Section 62 were to be given the construction advanced by plaintiff a placard would have to be posted even in those structures in which the floors were not capable of bearing the minimum load required by Section 61. In effect defendant would have to post a sign saying that he has not complied with the law. In light of the evidence adduced by plaintiff that a floor which is capable of bearing a live load of fifty pounds per square foot is adequate to support a human being, a more reasonable construction of Section 62 is to hold it applicable to those situations where it is foreseeable that the floor would be called upon to bear a load greater than that of a human being, *i.e.*, where the floor would have to bear the load of a human being and some heavy construction materials or equipment. In that sense the section would have some vitality consistent with its purpose in that a workman carrying or propelling such a load would have adequate warning of the fact that the floor would be unable to support him and the construction materials at the same time. This interpretation would therefore prevent injuries to workmen and avoid a redundant overlap with Section 61.

Such being the construction to be given Section 62 it is obvious that if this section was violated at all there is no evidence that the violation was willful or that it was the cause of plaintiff's injuries. Plaintiff was injured while walking on the floor. The floor in some way failed to support him. The fact that he was carrying a ladle full of lead which weighed a mere two or three pounds does not bring him within the protection afforded by Section 62.

■■ (2) Liability accrues under the Act only for injuries occasioned by a willful violation of or a willful failure to comply with its provisions.[3] This section was considered originally in *Schultz v. Henry Ericsson Co.* (1914), 264 Ill. 156, 166, where the court said:

> "The word "willfully" is synonymous with "knowingly" and to constitute a willful violation of the statute it is not necessary that there should have been "a reckless disregard" of its provision. The employer is liable not only when the dangerous conditions are known to him, but also when by the exercise of reasonable care the existence of such dangerous conditions could have been discovered and become known to him."

This language was reaffirmed in *Kennerly v. Shell Oil Co.* (1958), 13 Ill.2d 431, 439.

---

[3] Ill. Rev. Stat. 1959, ch. 48, par. 69, the pertinent section reads in part as follows: "For any injury to person or property, occasioned by any wilful violations of this act, or wilful failure to comply with any of its provisions, a right of action shall accrue to the party injured, for any direct damages sustained thereby * * *."

■■■ The evidence presented at trial fails to show that defendant willfully violated or willfully failed to comply with the terms of Sections 60 and 61 of the Structural Work Act. The record discloses that the defendants, subcontractors, tradesmen, and even plaintiff himself walked over the subflooring during the construction of the buildings. None of them noticed anything unusual about it. No evidence was ever adduced to disclose the nature or existence of the specific defect which caused plaintiff's foot to go through the subfloor other than the fact that the hole through which plaintiff's foot plunged had jagged edges. There was no showing that the boards were of insufficient thickness or improper quality to carry the load for which the floor was designed. Nor was there testimony that the boards contained too many knots, that knots were present at the place of the alleged defect or even that knots made the board weaker. If defendant is to be charged with a violation of the standards set up by the Act as construed by the cases, it is fundamental that the defective condition of which he is to be charged with actual or constructive knowledge must be shown to have existed. Such was not shown.

■■ (3) Due to our consideration of this case it is unnecessary to discuss in detail the question of proximate cause, another essential element as to which we believe there was a failure of proof even if a violation of the Act were to be assumed.

The judgment of the Circuit Court is reversed and remanded with directions to enter judgment in favor of defendant.

Reversed and remanded with directions.

DRUCKER and ENGLISH, JJ., concur.

